**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:                                                                  Chapter 11

96 WYTHE ACQUISITION LLC,                                 Case No. 21-22108 (SHL)

                                        Debtor.

-----------------------------------------------------------------x
STEPHEN S. GRAY, in his capacity as
Liquidation Trustee of the Liquidation Trust,

                                        Plaintiff,

                    vs.

THE WILLIAMSBURG HOTEL BK, LLC,                     Adv. Pro. No. 22-07049 (SHL)
TOBY MOSKOVITS, and
MICHAEL LICHTENSTEIN,

                                        Defendants.

-----------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>


**A P P E A R A N C E S:**

**TOGUT, SEGAL & SEGAL LLP**
*Counsel for Stephen S. Gray, in his capacity as the Liquidation Trustee of the Liquidation Trust*
One Penn Plaza
New York, New York 10119
By:    Frank A. Oswald, Esq.
         John McClain, Esq.

**FERN FLOMENHAFT PLLC**
*Counsel for Defendants The Williamsburg Hotel BK, LLC, Toby Moskovits, and Michael
Lichtenstein*
26 Broadway, 26th Floor
New York, New York 10004
By:    Fern Flomenhaft, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the *Trustee's Motion for Summary Judgment and Memorandum of Law in Support* [ECF No. 9][1] (the "Motion") against The Williamsburg Hotel BK, LLC (the "Manager"), Toby Moskovits ("Moskovits"), and Michael Lichtenstein ("Lichtenstein" and, together with the Manager and Moskovits, the "Defendants") in the above-captioned adversary proceeding, filed by Stephen S. Gray, the liquidation trustee (the "Trustee" or "Plaintiff") in the Chapter 11 case of 96 Wythe Acquisition, LLC (the "Debtor"). The dispute here concerns whether certain employee retention tax credits are property of the Debtor's estate and whether the related tax refunds, which were received by the Manager, should be turned over to the Debtor. The Trustee moves for summary judgment (i) declaring that the refunds are property of the Debtor's estate, (ii) concluding that the Defendants were unjustly enriched by their receipt of the refunds, and (iii) directing the Defendants to pay the refunds to the Trustee for the estate's benefit. *See* Motion at 2; *see generally* Complaint [ECF No. 1] (the "Compl.") at ¶¶ 1, 58–81. For the reasons set forth below, the Motion is granted.

## <u>BACKGROUND</u>

The following facts are derived from the *Parties' Joint Statement of Undisputed Material Facts* [ECF No. 10] (the "Undisputed Facts"), the *Trustee's Rule 7056-1 Statement of Material Facts for Which No Genuine Triable Issue Exists* [ECF No. 11] (the "Trustee's Facts"),[2] the

---

[1]      Unless otherwise indicated, references in this Memorandum of Decision to docket entries on the Case Management/Electronic Case Files ("ECF") system are to Adversary Proceeding No. 22-07049.

[2]      Local Rule 7056-1(d) provides that each numbered paragraph in a statement of material facts shall be deemed admitted for the purposes of the motion unless specifically controverted in the opposing party's responsive statement. *See* S.D.N.Y. LBR 7056-1(d). The Defendants did not submit a response to or refute the Trustee's Facts as required under Local Rule 7056-1(d). *See* S.D.N.Y. LBR 7056-1(d); *see also In re Sultan Realty, LLC*, 2012 WL 6681845, at *4 (Bankr. S.D.N.Y. Dec. 21, 2012). For purposes of summary judgment, therefore, the Court has

*Declaration in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment*
[ECF No. 13] (the "Lichtenstein Decl."), all attached exhibits, and the record of proceedings in
the underlying bankruptcy case (Case No. 21-22108).[3]

## I.    THE DEBTOR, THE MANAGER, AND THEIR RELATIONSHIP

At all relevant times for purposes of this dispute, the Debtor—a New York limited
liability company—owned the Williamsburg Hotel (the "Hotel") located at 96 Wythe Avenue,
Brooklyn, New York 11249. *See* Undisputed Facts ¶¶ 1–2. Prior to the Trustee's appointment as
Chapter 11 trustee (as discussed below), Defendant Manager—another New York limited
liability company—performed various services for the Debtor relating to the Hotel. *See id.* ¶¶ 4–
5. Specifically, the Manager managed the Hotel's operations for the Debtor, collected all
revenue generated by the Hotel, and employed personnel who performed services at and for the
Hotel, such as front desk, food and beverage, and cleaning services. *See id.* ¶ 5; *see also*
Lichtenstein Decl. ¶ 5 (describing Manager as "the sole and exclusive" employer of personnel
who performed services at and for the Hotel); *id.* ¶ 6 (Manager's duties included employing
Hotel personnel, managing operations and operating accounts, collecting Hotel revenue, and
paying operating costs, including employment expenses and taxes). The operating accounts from
which Hotel-related expenses were paid consisted of the Hotel's revenue and were controlled by

---

treated as undisputed those instances where the Defendants did not dispute a fact contained in the Trustee's Facts
that was properly supported by evidence submitted by the Trustee.

[3]    The Court may take judicial notice of proceedings in the underlying bankruptcy case for purposes of its
decision in this adversary proceeding. *See In re AMR Corp.*, 567 B.R. 247, 250, n.2 (Bankr. S.D.N.Y. 2017), *aff'd
sub nom. Krakowski v. Am. Airlines, Inc.*, 610 B.R. 714 (S.D.N.Y. 2019), *aff'd sub nom. In re AMR Corp.*, 834 F.
App'x 660 (2d Cir. 2021); *cf. Ferrari v. Cty. of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011) ("In the Rule
12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents
that appear in the court records of prior litigation and that relate to the case *sub judice*."); *Messer v. Wei Chu (In re
Xiang Yang Gao)*, 560 B.R. 50, 55 n.4 (Bankr. E.D.N.Y. 2016) (taking judicial notice of relevant documents filed in
debtor's bankruptcy case and related adversary proceedings) (citing cases); *Am. Tissue, Inc. v. Donaldson, Lufkin &
Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 96 n.17 (S.D.N.Y. 2004) ("The Court can take judicial notice of matters of
public record . . . including filings in related lawsuits . . . .").

3

the Manager.  *See id.* ¶¶ 7–8.  At all relevant times, Defendants Moskovits and Lichtenstein

owned and controlled both the Debtor and the Manager.  *See* Undisputed Facts ¶¶ 6–7.

On December 13, 2017, the Debtor, as borrower, and Benefit Street Partners Realty

Operating Partnership, L.P. ("Benefit Street"), as lender, entered into a loan agreement whereby

the Debtor borrowed $68,000,000 from Benefit Street.  *See* Case No. 21-22108, ECF No. 273-2,

*Loan Agreement* (the "Loan Agreement") at Recitals; *see also* Case No. 21-22108, ECF No. 273-

2, *Consolidated Note* at Art. 1.  On that same date, the Debtor, Benefit Street, and the Manager

executed an *Assignment of Hotel Management Agreement and Subordination of Hotel*

*Management Fees* [Case No. 21-22108, ECF No. 418-4] (the "December Agreement").  *See*

December Agreement at 1.  Per the December Agreement, the Debtor and the Manager agreed

that the Manager would manage the Hotel in exchange for certain hotel management fees, which

would be subordinated to Benefit Street's lien on the Hotel.  *See id.* at Recitals B–D.

Specifically, the Manager was entitled to compensation in the amount of 3% of gross rent

collected from the Hotel.  *See id.* at ¶ 6(c) ("Manager agrees that, notwithstanding anything to

the contrary contained in the Hotel Management Agreement, Manager shall not be entitled to

receive compensation for its services conducted in connection with the Property in excess of

three percent (3%) of gross rent collected from the Property."); *see id.* at Ex. A ("Manager shall

receive a management fee in the amount of 3.0% of the gross rents as of January 1 of each year,

payable on the first day of each month throughout the calendar year.").  In the same agreement,

the Manager acknowledged that all Rents[4] and revenues generated by the Hotel belonged to the

Debtor.  *See id.* at ¶ 21 ("Manager acknowledges and agrees that all portions of the Rents,

security deposits, issues, proceeds, profits and other revenues of the Property collected by it shall

---

[4]      "Rents" are defined in the Loan Agreement, § 1.4(f).

be solely in it is capacity as the agent for the Borrower, such monies are the sole property of the
Borrower, encumbered by the lien of the Security Instrument and other Loan Documents in favor
of Lender and Manager has no right to, or title in, such monies except as provided in the
Management Agreement, or at law or equity.").

In both this adversary proceeding and the main case, all parties have agreed that the
Manager used the Hotel's revenue to satisfy the payroll obligations, including taxes, for the
employees who worked at the Hotel. *See* Trustee's Facts ¶ 2 ("[T]he Manager used the Debtor's
Hotel revenues to satisfy its payroll obligations for the Manager's employees who worked at the
Debtor's Hotel, including employment-tax obligations.") (citing *Defendants' Response and
Objection to Trustee's Motion for an Order Expunging or Subordinating Claim No. 33-35 by the
Williamsburg Hotel BK LLC* [Case No. 21-22108, ECF No. 967] ("It is undisputed that the
Manager was using and was entitled to use the Debtor's cash flow to satisfy the payroll
obligations for the Manager's employees who worked at the Debtor's hotel, including tax
obligations. . . . [P]ayment is the obligation of the Debtor."); *Declaration in Support of
Defendants' Response and Objection to Trustee's Motion for an Order Expunging or
Subordinating Claim No. 33-35 by the Williamsburg Hotel BK LLC* [Case No. 21-22108, ECF
No. 968] (filed proofs of claim were for "the employer's share of Social Security taxes[,]" the
payment of which was "the obligation of the Debtor"); *see also* Lichtenstein Decl. ¶¶ 6–8
(describing how the Manager collected Hotel revenue, placed revenue into Manager-controlled
operating accounts, and used Hotel revenue to pay all operating costs, including payroll and
taxes for the Manager's employees). The Manager, as employer, also reported those employment
taxes to the Internal Revenue Service ("IRS") on Forms 941 and 941-X on a quarterly basis. *See*
Undisputed Facts ¶ 8; *see also id.* at Exs. 1–3 (naming Manager as employer).

## II.       THE PANDEMIC AND EMPLOYEE RETENTION TAX CREDITS

The COVID-19 pandemic began in early 2020.  The pandemic's effects were wide-reaching, and it had a particularly devastating impact on the hospitality industry.  In response to the COVID-19 pandemic, the federal government enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").  *See In re PS On Tap, LLC*, 669 B.R. 56, 62–63 (Bankr. C.D. Cal. 2025) (citing Pub. L. No. 116-136, 134 Stat. 281 (2020)).  The CARES Act provided economic relief and assistance to, among others, small businesses and industry sectors affected by the pandemic through a variety of programs.  *CARES Act*, OFFICE OF THE INSPECTOR GENERAL, https://oig.treasury.gov/cares-act (last visited June 24, 2025); *see also About the CARES Act and the Consolidated Appropriations Act*, U.S. DEPT. OF THE TREASURY, https://home.treasury.gov/policy-issues/coronavirus/about-the-cares-act (last visited June 24, 2025).  One such program was the Employee Retention Credit, a refundable employee retention tax credit (the "ERTC") allowed against certain employment taxes and available to certain eligible employers affected by the pandemic who paid qualified wages to employees after March 12, 2020 and before January 1, 2022.  *See COVID-19-Related Employee Retention Credits: Overview*, INTERNAL REVENUE SERVICE, https://www.irs.gov/newsroom/covid-19-related-employee-retention-credits-overview (last visited June 24, 2025); *see also Employee Retention Credit*, INTERNAL REVENUE SERVICE, https://www.irs.gov/coronavirus/employee-retention-credit (last visited June 24, 2025); *In re PS On Tap, LLC*, 669 B.R. at 63.  Qualifying businesses included those that were suspended by a government order due to the pandemic or experienced a decline in gross receipts during 2020 or the first three calendar quarters of 2021.  *Employee Retention Credit*, INTERNAL REVENUE SERVICE, https://www.irs.gov/coronavirus/employee-retention-credit (last visited June 24, 2025); *In re Glob. Aviation Tech. LLC*, 2024 WL 3506432,

at *1 (Bankr. D. Kan. July 19, 2024) ("[A]n ERTC is a refundable employment tax credit that incentivized businesses to retain and continue paying employees during the COVID pandemic when businesses were shutting down due to government order or experiencing significant decline in business revenue.").  Among ways to claim the credit, businesses that filed quarterly employment tax returns could file Form 941-X (Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund) to claim the credit for prior 2021 quarters.  *Employee Retention Credit*, INTERNAL REVENUE SERVICE, https://www.irs.gov/coronavirus/employee-retention-credit (last visited June 24, 2025); *see In re Glob. Aviation Tech. LLC*, 2024 WL 3506432, at *1 ("Employers who satisfy the eligibility requirements complete an amended quarterly payroll tax return to calculate and apply the tax credit . . . .").  Excess credits were treated as an overpayment refundable under Sections 6402(a) and 6413(b) of the Internal Revenue Code.  *See* 26 U.S.C. 3134(b)(3); *In re Glob. Aviation Tech. LLC*, 2024 WL 3506432, at *1 ("If the tax credit exceeds the amount of the employer's share of the payroll taxes owed for a given quarter, the excess (overpayment) is refunded, or paid, to the employer."); *id.* at *4; *In re PS On Tap, LLC*, 669 B.R. at 63.

Following the enactment of the CARES Act, the Manager claimed a total of $2,305,503.80 in ERTC refunds for the first, second, and third quarters of 2021.  *See* Undisputed Facts ¶¶ 9–12.  For the first quarter, the Manager claimed $408,263.92 in ERTC refunds, which the IRS paid to the Manager in November 2021 by post-petition check (such amounts, the "First Quarter Refund").  *See* Undisputed Facts ¶ 9; *see id.* at Ex. 1.  For the second quarter, the Manager claimed $764,816.70 in ERTC refunds.  *See* Undisputed Facts ¶ 10; *see id.* at Ex. 2.  In response, the IRS notified the Manager that $2,551.37 in interest had accrued on the refund

claimed for the second quarter and was owed by the IRS, but $291,919.14[5] was applied by the

IRS to other taxes and a civil penalty owed by the Manager for tax periods ending in 2018, 2019,

2020, and 2022. *See* Undisputed Facts ¶ 14; *see id.* at Ex. 4. As a result, the IRS stated that the

ERTC refund due for the second quarter of 2021 was $475,448.94, which has since been

received and is being held in escrow by Defendants' counsel (such amounts, the "Second Quarter

Refund"). *See* Undisputed Facts ¶ 14; *id.* at Ex. 4; *see also* Reply 2 n.2. For the third quarter,

the Manager claimed $1,132,423.18 in ERTC refunds, which the IRS paid to the Manager in

November 2021 by post-petition check (such amount, the "Third Quarter Refund" and, together

with the First Quarter Refund and the Second Quarter Refund, the "ERTC Refund"). *See*

Undisputed Facts ¶ 11; *see id.* at Ex. 3. Thus, a total of $1,540,687.10 was paid to the Manager,

for which the Manager provided the Trustee an accounting, and $475,448.94 remains in escrow,

representing the entire ERTC Refund in dispute here.[6] *See* Undisputed Facts ¶ 13; *see also*

Reply 2 n.2.

## III.    THE BANKRUPTCY CASE

The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code

in February 2021 (the "Petition Date"). *See* Case No. 21-22108, ECF. No. 1. In October 2021,

Benefit Street filed its *Motion to Appoint an Examiner Pursuant to 11 U.S.C. § 1104(c)* [Case

---

[5]     The Trustee has asked for an explanation of these offsets, s*ee Reply Brief in Support of Trustee's Motion for Summary Judgment* [ECF No. 15] (the "Reply"), 2 n.2, which is an appropriate request that the Court fully expects to be complied with by the Manager and the Debtor's two principals.

[6]     After oral argument, the Defendants' counsel received a Tax Compliance Levy and Final Demand from the New York State Department of Taxation and Finance, demanding that counsel remit the Second Quarter Refund held in escrow to satisfy sales tax obligations owed by the Manager and the Debtor. *See Letter from Defendants dated July 25, 2024* [ECF No. 20]. Counsel remitted the form, indicating that $475,448.93 was restricted and subject to turnover. *See id.* In response, the Trustee pointed out that the levy does not mention the Debtor and rather indicates that the Manager was a judgment debtor in connection with litigation between New York state and the Manager. *See* Letter dated July 29, 2024 [ECF No. 21].

No. 21-22108, ECF. No. 147], which was granted by the Court on November 8, 2021 [Case No.

21-22108, ECF No. 178].  On November 16, 2021, the Court entered the *Order Approving*

*Appointment of Eric M. Huebscher as Examiner*.  *See* Case No. 21-22108, ECF No. 186.  The

examiner ultimately found that the principals of the Debtor, Toby Moskovits and Michael

Lichtenstein, were running the bankruptcy case for their own benefit, as opposed to the benefit of

all creditors, and that there were grounds to appoint a trustee in the Chapter 11 case.  *See*

*generally Report of Examiner, Eric M. Huebscher*, dated Feb. 28, 2022 [Case No. 21-22108,

ECF No. 418] at 24 ("[T]he investigation raises significant areas of concern surrounding the

conduct of [Moskovits and Lichtenstein], both in their roles in the multitude of challengeable

transactions identified in this report, but also in their fiduciary roles in administering the

bankruptcy estate, including their lack of independence."); *Supplemental Report and Rebuttal of*

*Examiner, Eric M Huebscher* [Case No. 21-22108, ECF No. 465] at 6 ("While the Report raises

significant concerns about the lack of independence by the Principals, the promulgation of

Counter-Report and Debtor's Response significantly amplifies these concerns."); *id.* at 8

("Overwhelming evidence exists to support continuation of the investigation by the Examiner or

others.").  At the end of May 2022, the Court entered an *Order Approving the Appointment of*

*Chapter 11 Trustee*, appointing Stephen S. Gray as Chapter 11 Trustee.  *See* Case No. 21-22108,

ECF No. 594.

Ultimately, a plan of liquidation (the "Plan") was confirmed in this case on April 10,

2023 [Case No. 21-22108, ECF No. 1005] and became effective later that month.  *See* Case No.

21-22108, ECF No. 1015.  Upon the Plan's effective date, Mr. Gray's role as Chapter 11 Trustee

concluded, and he began his tenure as the liquidation trustee for the liquidation trust established

under the Plan.  *See* Undisputed Facts ¶ 3; *see also* Case No. 21-22108, ECF No. 1005, Ex. A.

The liquidation trust was formed, among other functions, to recover and distribute assets for the benefit of the Debtor's estate.  *See* Undisputed Facts ¶ 3; *see also* Case No. 21-22108, ECF No. 1005, Ex. A.  Among his roles, the Trustee was empowered to prosecute and settle any claims and causes of action of the Debtor's estate.  *See* Undisputed Facts ¶ 3; *see also* Case No. 21-22108, ECF No. 1005, Ex. A at § 5.5.

## IV.    PROCEDURAL HISTORY

The Trustee filed this adversary proceeding in December 2022.  *See generally* Complaint. In this adversary, the Trustee seeks entry of a judgment, among other things, (i) declaring that the proceeds of the ERTC Refund that were claimed by the Manager are property of the Debtor's estate; (ii) directing the Defendants to turn over to the Trustee the ERTC Refund; (iii) directing the Defendants to produce a written accounting regarding the disposition and transfer of any amount of the ERTC Refund; and (iv) awarding attorney's fees and costs.  *See id.* at ¶ 1.  The Defendants submitted an answer in early February 2023.  *See* Answer [ECF No. 4] (the "Answer").  The Trustee filed this Motion, along with the Undisputed Facts and the Trustee's Facts, in late June 2023.  One month later, the Defendants submitted the *Defendants' Opposition to Trustee's Motion for Summary Judgment and Memorandum of Law* [ECF No. 14] (the "Opposition"), along with the Lichtenstein Decl.  The Trustee subsequently filed its Reply. Oral argument on the Motion was held in February 2024.

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Summary Judgment

Under Federal Rule of Civil Procedure 56, made applicable to this case under Federal Rule of Bankruptcy Procedure 7056, "[t]he court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056.  A genuine issue of

material fact exists "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving

party bears the initial burden of establishing that no genuine issue of material fact exists.  *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the non-moving

party to produce "specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

The non-movant must present "concrete evidence from which a reasonable juror could return a

verdict in his favor," *Anderson*, 477 U.S. at 256, and "may not rely on conclusory allegations or

unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citations

omitted); *see also Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("[C]onclusory

statements, conjecture, or speculation by the party resisting the motion will not defeat summary

judgment.") (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).  In short, if the

Court determines that "the record taken as a whole could not lead a rational trier of fact to find

for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475

U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).

        In ruling on a motion for summary judgment, the court must draw all reasonable

inferences against the moving party.  *See Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir.

2001).  However, "the mere existence of some alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S.

at 247–48.  "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  Properly supported facts that are presented in a statement of material facts, and not specifically controverted by an opposing party, are deemed to be admitted.  *See* S.D.N.Y. LBR 7056-1(d) ("Each numbered paragraph in the statement of material facts required to be served by the moving party shall be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

      B.    <u>Property of the Estate</u>

Upon commencement of a bankruptcy case, an estate is created that is comprised of a debtor's property, wherever located and by whomever held.  *See* 11 U.S.C. § 541(a); *see also In re Metro Affiliates, Inc.*, 2013 WL 6042243, *2 (Bankr. S.D.N.Y. Nov. 8, 2013) ("The commencement of a bankruptcy case creates an estate comprised of the debtor's property, wherever located and by whomever held.") (citation omitted); *In re Soho 25 Retail, LLC*, 2011 WL 1333084, at *8 (Bankr. S.D.N.Y. Mar. 31, 2011) ("Section 541 of the Bankruptcy Code defines the bankruptcy estate as including 'all legal or equitable interests of the debtor in property as of the commencement of the case' wherever they are located and by whomever they are held.") (citation omitted).  Section 541(a) of the Bankruptcy Code lists various categories of property which are included in the debtor's estate.  *See id.*  "Property of the estate is broadly defined to include 'all legal or equitable interest of the debtor in property as of the commencement of the case,' as well as '[p]roceeds product, offspring, rents, or profits of or from property of the estate,' and '[a]ny interest in property that the estate acquires after the commencement of the case.'"  *In re Arcapita Bank B.S.C.(c)*, 628 B.R. 414, 480 (Bankr.

S.D.N.Y. 2021), *aff'd sub nom. In re Arcapita Bank B.S.C.(c)*, 640 B.R. 604 (S.D.N.Y. 2022) (citing 11 U.S.C. §§ 541(a)(1), (6), (7)).

Assets within the estate are those that exist as of the commencement of the case, such that property acquired by the debtor after the filing of a petition generally does not become part of the estate. *See Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d. Cir. 2008) (citation omitted). However, under Section 541(a)(7), after-acquired property will vest in the estate if it is derived from property that was part of the estate as of the commencement of the bankruptcy case. *See id.* (citing *Segal v. Rochelle*, 382 U.S. 375, 380 (1966)). "Post-petition property will become property of the estate only if it is 'sufficiently rooted in the pre-bankruptcy past.'" *Id.* (quoting *Segal*, 382 U.S. at 380).

Congress intended "property of the estate" to be broadly defined and interpreted. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983) ("[] Congress intended a broad range of property to be included in the estate . . .. The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad.") (citations omitted); *In re Prudential Lines Inc.*, 928 F.2d 565, 569 (2d Cir. 1991) ("In construing this section, we are mindful that Congress intended § 541 to be interpreted broadly.") (citation omitted); *In re Ames Dept. Stores, Inc.*, 287 B.R. 112, 121 (Bankr. S.D.N.Y. 2002) (citation omitted) ("The Supreme Court has recognized that Congress intended property of the estate to be defined broadly.") (citation omitted). Indeed, every conceivable interest of the debtor, and anything of value, should be brought into the estate. *See Chartschlaa*, 538 F.3d at 122 ("[E]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541.") (citation omitted); *In re Ames Dept. Stores*, 287 B.R. 112, 121 (Bankr. S.D.N.Y.

2002) ("The Second Circuit has noted that Congress wished to 'bring anything of value that the debtors have into the estate.") (citing *In re Prudential Lines, Inc.*, 928 F.2d at 573).

The Bankruptcy Code determines what may constitute property of the estate. *See In re Soho Retail, LLC*, 2011 WL 1333084, at *4 (citations omitted); *see also In re Prudential Lines Inc.*, 928 F.2d at 569 ("Whether that interest is included in the property of the debtor's estate is determined by bankruptcy law.") (citations omitted). State law determines the nature of a debtor's interest in property. *See In re Soho Retail, LLC*, 2011 WL 1333084, at *4 ("[S]tate law determines the nature of the debtor's interest in a given item.") (citations and internal quotations omitted); *id.* at *8 ("Such interests are defined by reference to state law.") (citation omitted); *see also In re Prudential Lines Inc.*, 928 F.2d at 569 ("The nature and extent of the debtor's interest in property is determined by applicable non-bankruptcy law.") (citations omitted); *see also In re South Side House, LLC*, 474 B.R. 391, 402 (Bankr. E.D.N.Y. 2012) ("Courts look to state or other applicable nonbankruptcy law to determine whether a debtor has a prepetition interest in property[.]") (citation omitted). "When a debtor has an interest in property under state law, Section 541(a) determines if that interest is sufficient to bring the property into the estate." *Id.* (citation omitted).

C.    Turnover Under Section 542

"Section 542(a) of the Bankruptcy Code governs turnover of property of the estate held by an entity that is not a custodian." *In re Celsius Network LLC*, 664 B.R. 85, 102 (Bankr. S.D.N.Y. 2024). Section 542(a) provides as follows:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

14

11 U.S.C. § 542(a).  A "party seeking turnover must establish (1) that the property is or was in

possession, custody or control of [another] entity during the pendency of the case, (2) that the

property may be used . . . in accordance with [Section] 363 or exempted by the debtor under

[Section] 522; and (3) that the property has more than inconsequential value or benefit to the

estate."  *See In re Celsius Network LLC*, 664 B.R. at 103 (citations omitted).  The party seeking

turnover bears the burden of proving, by a preponderance of the evidence, that the property

belongs to the estate.  *See id.* (citations omitted).

      D.      <u>Unjust Enrichment</u>

      "Under New York law, a plaintiff asserting a claim of unjust enrichment must show that

the defendant was enriched at the plaintiff's expense and that equity and good conscience require

the plaintiff to recover the enrichment from the defendant."  *In re Pretty Girl, Inc.*, 644 B.R. 298,

311 (Bankr. S.D.N.Y. 2022) (quoting *Golden Pacific Bancorp v. F.D.I.C.*, 375 F.3d 196, 203 n.8

(2d Cir. 2004)).  A plaintiff asserting a claim for unjust enrichment "must establish (1) that the

defendant benefitted; (2) at the plaintiff's expense, and (3) that equity and good conscience

requires restitution."  *In re Pretty Girl, Inc.*, 644 B.R. at 311 (citing *Kaye v. Grossman*, 202 F.3d

611, 616 (2d Cir. 2000); *see also Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983))

(quotations omitted); *Geron v. Central Park Realty Holding Corp. (In re Nanobeak Biotech Inc.)*,

656 B.R. 350, 368 (Bankr. S.D.N.Y. 2024) ("The elements needed to plead an unjust enrichment

are (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity

and good conscience to permit [the other party] to retain what is sought to be recovered.")

(citations and internal quotations omitted).  A specific and direct benefit is necessary to support

an unjust enrichment claim.  *See Kaye*, 202 F.3d at 616.  Further, "the essential inquiry in any

action for unjust enrichment or restitution is whether it is against equity and good conscience to

permit the defendant to retain what is sought to be recovered." *In re Nanobeak Biotech Inc.*, 656 B.R. at 368 (citation omitted); *see also In re Kossoff PLLC*, 2024 W 1715011, at *6 (Bankr. S.D.N.Y. Apr. 19, 2024) ("Courts place emphasis on the third element as the 'essential inquiry' in an unjust enrichment action.") (citation omitted).

Unjust enrichment is available when the defendant has neither breached a contract nor committed a tort, but "circumstances create an equitable obligation running from the defendant to the plaintiff." *See Sama v. Mullaney (In re Wonderwork, Inc.)*, 611 B.R. 169, 217 (Bankr. S.D.N.Y. 2020) (quoting *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012)). "Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Id.* (quoting *Corsello*, 18 N.Y.3d at 790)). "[T]o determine if it is against equity to permit a party to retain what is sought to be recovered, courts look and see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent." *Columbia Mem'l Hosp. v. Hinds*, 38 N.Y.3d 253, 275, (2022) (citation and internal quotation omitted).

The existence of a valid and enforceable written contract governing a particular subject matter generally precludes recovery on an unjust enrichment claim. *See Sama*, 611 B.R. at 217 (citations omitted); *see also In re Ricje & Assoc., Inc.*, 272 B.R. 74, 96 (Bankr. S.D.N.Y. 2002) ("Under New York law, quasi-contractual claims such as unjust enrichment are barred if a written contract between the parties governs the subject matter of their dispute.") (citations omitted). Unjust enrichment is a quasi-contractual claim and is an obligation created by law in the absence of an agreement. *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (citation omitted); *In re Wonderwork, Inc.*, 611 B.R. at 217

(citations omitted); *see also Goldman v. Metro Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005); *Clarke-Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 388–89 (1987) ("Briefly stated, a quasi-contractual obligation is one imposed by law *where there has been no agreement or expression of assent, by word or act, on the part of either party involved*. The law creates it, regardless of the intention of the parties, to assure a just and equitable result.") (citation and internal quotations omitted) (emphasis in original); *see also Goldberg v. Pace Univ.,* 88 F.4th 204, 214 (2d Cir. 2023) ("In New York, claims in quasi-contract such as unjust enrichment and promissory estoppel are ordinarily precluded if a valid and enforceable written contract, even an implied contract, govern[s] the relevant subject matter.") (citation and internal quotations omitted). Unjust enrichment is intended to prevent injustice in the absence of an actual agreement between the parties. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009).

## II.     Trustee's Unjust Enrichment Claim

### A.   The Hotel's Revenue Belonged to the Debtor

As a threshold matter, the Defendants do not dispute, and indeed agreed in the December Agreement, that all Hotel revenue, whether earned pre- or post-petition, belonged to the Debtor. *See* December Agreement ¶ 21. Thus, the revenue is property of the Debtor's estate. *See* 11 U.S.C. § 541(a)(6); *In re Indianapolis Downs, LLC*, 462 B.R. 104, 111 (Bankr. D. Del. 2011), *vacated sub nom. In re Indianapolis Downs Liquidation One, LLC*, 2013 WL 12476432 (Bankr. D. Del. July 16, 2013) ("In bankruptcy, property of the estate includes a debtor's interest in property acquired after the bankruptcy case begins…. So as the Debtor generates revenue post-petition, the revenue becomes property of the estate."); *In re 5877 POPLAR, L.P.*, 268 B.R. 140, 145 (Bankr. W.D. Tenn. 2001) ("The court holds that a literal reading of [S]ection 541(a)(6)

includes profits generated from the hotel which compose this bankruptcy estate property under a broad, yet proper, reading of property of the estate under [S]ection 541(a)(6).") (revenue generated hotel owned and operated by debtor was property of the estate).  This result is consistent with decisions in other hotel cases, holding that such revenue is the debtor's property.  *See In re Hari Ram, Inc.*, 507 B.R. 114, 124–25 (Bankr. M.D. Pa. 2014) (hotel room revenues remained property of the estate when debtor filed petition because mortgage holder did not take steps to obtain the right to receive the rents and cut off debtor's rights to receive same under Pennsylvania law); *In re Ocean Place Dev., LLC*, 447 B.R. 726 (Bankr. D.N.J. 2011) (holding hotel room revenues are personal property and available for use as cash collateral as property of estate); *cf. In re AGA Mgmt., LLC*, 2010 WL 5315940, at *3 (Bankr. D. Ariz. Dec. 20, 2010) (concluding, on an interlocutory basis, that golf course revenue belonged to debtor, as management company, and its estate, and were not subject to any trust prior to deposit into an escrow account); *In re Neuman*, 75 B.R. 966, 969 (Bankr. S.D.N.Y. 1987), *aff'd*, 88 B.R. 30 (S.D.N.Y. 1988) (nursing home's revenue, which was the product of the business' invested capital, accounts receivable, and good will, was property of the estate); *but see In re Kingsport Ventures, L.P.*, 251 B.R. 841, 845 (Bankr. E.D. Tenn. 2000) (motel revenues subject to prepetition absolute assignment were not property of the estate).  As the taxes paid for the employees— which were returned in the form of the ERTC refunds—were from hotel revenue, it would logically follow that the ERTC refunds are property of the Debtor's estate.

Defendants attempt to distinguish "funds," "profits," "cash flow," and "revenue" to argue that Defendants are entitled to keep the ERTC refunds as profits (as distinguished from revenue belonging to the Debtor).  *See generally* Opposition ¶¶ 5–17.  But Defendants' argument is really one of semantics, rather than substance.  Per the December Agreement, all Rents and revenue

belonged to the Debtor.  *See* December Agreement ¶¶ 6, 21, Ex. A.  The Manager has not

challenged this fact, and nothing in the record suggests a basis for a different result.  The record

also makes clear that the Manager's compensation is based solely on a percentage of gross rents,

leaving unclear how these ERTC funds could ever qualify as part of the Manager's

compensation.[7]  Defendants' own arguments indicate that the revenue belonged to the Debtor, no

matter its name.  The Defendants previously admitted that the Manager used the Debtor's "cash

flow" to satisfy its payroll obligations.  *See* Trustee's Facts ¶ 2 (citing *Defendants' Response and

Objection to Trustee's Motion for an Order Expunging or Subordinating Claim No. 33-35 by the

Williamsburg Hotel BK LLC* [Case No. 21-22108, ECF No. 967]).  And in this litigation, the

Defendants admitted to collecting "revenue" and paying operating costs, including taxes, from

the revenue.  *See* Lichtenstein Decl. ¶ 6.  Mr. Lichtenstein indicated there is no real distinction

between these terms, stating: "The Hotel operating accounts consisted of Hotel *revenue*, which

was the primary source of the *cash flow* used to pay operating costs, including payroll and

taxes."  *Id.* ¶ 7 (emphasis added).  Regardless of the name, those monies were generated by the

Hotel and belonged to the Debtor.  *See* 11 U.S.C. § 541(a).

Indeed, Defendants' reliance on the term "profit" proves too much.  Defendants contend

that somehow these monies are "profits" that were never intended to cover employment taxes but

instead were to be returned to the Owner, that is the equity holders.  *See* Opposition ¶¶ 14-16.

But in bankruptcy, such profits from the Hotel are an asset of the Debtor's estate, and it would be

blatantly improper for the equity holders to snatch such value for themselves at the expense of

creditors.

---

[7]     Defendants have not argued that the ERTC refunds had any relationship or impact in any way as to how the
gross rents are calculated.  Indeed, there is no evidence in the record suggesting this is the case.

B. <u>Defendants Did Not Produce Evidence Establishing a Separate Contractual
Relationship Between the Debtor and the Manager on These Matters</u>

Defendants argue that Plaintiff's unjust enrichment claim is barred by the existence of a

contractual relationship between the Debtor and the Manager.  But the Court disagrees.  The

Trustee brought this unjust enrichment action because the Manager's use of the Debtor's Hotel's

revenues was not specifically governed by any contract.  *See* Motion 11 n.4 ("The Trustee has

brought claims sounding in equity, rather than legal claims, because the Manager's use of the

Debtor's funds to pay its employees and employment taxes was not the subject of any contractual

agreement.").  Defendants allude to the existence of a separate agreement governing

management fees and Manager's use of Hotel revenues for operating costs.  *See* Opposition at

1–2; ¶¶ 8, 24–30, 34, 41, 44, 54; *see also* Lichtenstein Decl. ¶¶ 6, 8.  But Defendants neither

provided a copy of any such separate agreement on the subject nor identified where one could be

located.  *See* Reply ¶ 11 (observing that neither the Opposition nor Lichtenstein Decl. attaches a

contract or cites to any part of the record where such separate agreement can be located); *see

also* Hr'g Tr. (June 6, 2024) [ECF No. 19] ("Hearing Transcript") 15:8–10 ("[O]ne of the things

about unjust enrichment is that the defendants point to a contract.  Of course they don't attach the

contract.").  Indeed, Defendants conceded there is no such contract when asked to identify one

by the Court.  *See* Hearing Transcript 28:18 ("I'm not relying on the contracts.").[8]

Unsubstantiated statements that a contract governing this subject matter was in existence are

insufficient to defeat the Plaintiff's unjust enrichment claim.  *See Scotto v. Almenas*, 143 F.3d

---

[8]       At the hearing, there was a lengthy discussion about various agreements, including a Hotel Management
Services Agreement dated November 21, 2017, as well as the December Agreement.  *See generally* Hearing
Transcript 15-31.  The Defendants agreed that the November 2017 agreement was not referenced in the Plaintiff's
papers.  *See* Hearing Transcript 16:3-10, 20:18-20, 21:14-15.  In any event, that agreement was previously
determined to have likely been fabricated.  *See* Case No. 21-22108, ECF No. 598, 122:15-123:2; *see also* Reply 9
n.6.  For all these reasons, it is irrelevant for purposes of this dispute.

105, 114 (2d Cir. 1998) (citations omitted); *see also Flores v. United States*, 885 F.3d 119, 122

(2d Cir. 2018).[9]

### C.    The Manager Was Enriched By its Retention of the ERTC Refund

Having cleared these threshold hurdles, the Court addresses the meat of Plaintiff's unjust

enrichment claim.  The Plaintiff has established the first element of its unjust enrichment claim

because the Defendants were enriched by their retention of the ERTC Refund.  As discussed

above, the Hotel revenue is Debtor's property.  The Defendants used the revenue to pay the

Manager's employment taxes.  The Defendants were subsequently enriched when they received,

retained, and disbursed the ERTC Refund—which came from the Debtor's property—rather than

turning it over to the Debtor.[10]

### D.    The Defendants' Enrichment Was at the Estate's Expense

The Plaintiff has established the second element of unjust enrichment because the

Defendants were enriched at the estate's expense.  These taxes were paid with the Debtor's

revenue, and those taxes were then eventually refunded to the Manager.  *See* Undisputed Facts ¶¶

9–15; *id.* at Exs. 1–4; Trustee's Facts 1.  If the ERTC Refund was paid to the Debtor, the funds

clearly would have become property of the estate.  Those monies could then have been used to

pay the Debtor's other debts, whether they be administrative expenses or the claims of

---

[9]    One might argue that this dispute is covered by the December Agreement because that agreement sets forth
the Manager's compensation.  But neither party made this argument.  *See, e.g.*, Reply at ¶ 16. ("[T]he Assignment
and Management Agreement is altogether silent regarding the Manager's use of the Hotel revenues and how any
refunds of the Hotel revenues would be handled.").  But even assuming that one considers the December Agreement
to govern here, the Court would reach the same result because the Manager would only be entitled to the specified
compensation in that agreement: a percentage of gross rents.

[10]    The Defendants provided the Trustee a purported accounting indicating that over $500,000 of the ERTC
Refund was disbursed by the Manager to Moskovits and Lichtenstein personally, and the remainer was disbursed to
other entities whose connections to the Hotel are unknown.  *See* Reply 2 n.2; *see supra* fn. 3.

prepetition creditors.  Because those monies were retained and disbursed by the Defendants, the Defendants were enriched at the expense of the estate.

Defendants do not identify any facts in the record that justify that result.  Defendants do argue that the Manager was entitled to retain the ERTC Refund on account of management fees and shortfalls allegedly covered by the Defendants.  *See* Opposition ¶¶ 15–17, 31–38.  The Defendants also argue that the Trustee did not show that the refunded sums would have been used to reimburse the Defendants for the costs they purportedly funded for the Hotel's operations.  *See* Opposition ¶¶ 15–17.  But Defendants' actions and arguments fail as inconsistent with core bankruptcy principles.  Bankruptcy is a collective proceeding whereby a debtor's creditors are paid pursuant to a priority scheme, which is aimed at treating similarly situated creditors equally.  To the extent a debtor owes money to a creditor, the creditor holds a claim that will be addressed and paid in the bankruptcy case.  Here, the Manager had one or more claims against the Debtor on account of management fees owed to it.  To the extent the Manager provided other services or funds requiring compensation, it was required to file a claim by the bar date, and such claims will either be paid or the subject of an objection.  By retaining the ERTC Refund however, the Manager engaged in impermissible self-help by paying itself directly as opposed to being paid through in the bankruptcy case in "bankruptcy dollars," consistent with the recovery of other creditors.  Even if the Manager was entitled to a payment for services or value provided after the filing of the bankruptcy—with such as administrative claim having a higher priority than general unsecured creditors—administrative creditors here were not paid in full but rather were paid *pari passu* from available funds because there were insufficient funds to pay all administrative creditors.  *See* Case No. 21-22108, *Stipulation and Order by and Between the Chapter 11 Trustee, Benefit Street Partners Realty Operating*

*Partnership, and the Debtor's Professionals* [ECF No. 1000] (agreement between Trustee and various administrative claimants limiting amounts of administrative claims); *see generally In re Microvideo Learning Sys., Inc.*, 232 B.R. 602, 609-10 (Bankr. S.D.N.Y. 1999) (denying motion for payment of a post-petition, pre-rejection lease when faced with an administratively insolvent debtor because an early payment would effectively give the claimant "a super-priority over other administrative expense creditors").

For this same reason, it is irrelevant that Mr. Lichtenstein claims that other suppliers and vendors went unpaid at the time the taxes were paid in 2021. *See* Lichtenstein Decl. ¶ 13. If the ERTC Refund been turned over to the Debtor, it would have been used for the benefit of the entire estate by being distributed to all creditors—including such suppliers and vendors—consistent with the Bankruptcy Code, rather than taken by one party at the expense of all others.[11]

### E.   Equity and Good Conscience Require Restitution

The Plaintiff also has satisfied the third element of its unjust enrichment claim that equity and good conscience require restitution in this case. The Defendants used the Debtor's property to pay the Manager's tax obligations and enriched themselves by keeping the ERTC Refund for their own use rather than returning those sums back to the Debtor. In doing so, the Defendants harmed the Debtor and its estate by exercising control over property of the estate that would have been distributed among creditors.

---

[11]     Defendants argue that their use of this money to pay other expenses would keep it out of the estate. *See* Opposition ¶ 15. However, the payment of Hotel expenses after the bankruptcy filing was an obligation of the debtor-in-possession (and eventually the Chapter 11 Trustee), which means the money should have to be held by the Debtor (or the Chapter 11 Trustee) to pay expenses. *See* Hearing Transcript 35:6-15. ("But that's what a debtor-in-possession does. It presents monthly operating reports that list the income and then list the expenses….But your argument seems to say that the Debtor here doesn't have any income, that it—somehow it has lost its right to have any income from the hotel that it owns.").

Defendants have not justified their retention of the ERTC Refund.  As discussed above, the purported existence of any management fees owed to the Defendants does not justify retention of property of the estate when there were other similarly situated creditors waiting to get paid.  Second, it is immaterial that the Manager paid the taxes, applied for ERTC credits, and was issued the ERTC Refund.  *See* Opposition at 1.  The Court agrees with the Trustee that the facts relating to the particulars of these taxes have no bearing on unjust enrichment and principles of equity.  *See* Hearing Transcript 13:22-23 ("The fact that this involves tax payments really is secondary to our argument.").  In the end, these taxes were paid with Hotel revenue owned by the Debtor and the refund for such payment belongs to the Debtor, not the Manager. *See* Hearing Transcript 33:19–25 ("[C]onsistent with the IRS Code 602, tax refunds are made to the person who made the overpayment, and [] that's the Debtor because it's the Debtor's money. And even if it wasn't, even if you said that should be the taxpayer, the idea would be, well, the actual person who footed the bill as a matter of equity is the Debtor.").  As the revenue belonged to the Debtor in the first instance, the refund of taxes paid by such revenue should have been returned to the estate when the ERTC Refund was issued.[12]

F.   <u>Tax Law Does Not Bar the Instant Lawsuit</u>

Even considering the nuances of tax law, Defendants have not provided any argument based on the tax law that would change the result here.  The Plaintiff and Defendants each discuss the implication of 26 U.S.C. § 6402(a), which provides:

> In the case of any overpayment, the Secretary, within the
> applicable period of limitations, may credit the amount of such

---

[12]    In seeking the requested equitable relief, the Trustee relies upon the fact that the parties were in an agency relationship.  *See* Motion ¶¶ 15-18.  However, the Court need not reach the issue of agency to find that the Defendants were unjustly enriched here.  *See In re Celsius Network LLC*, 664 B.R. 85, 99 (Bankr. S.D.N.Y. 2024) ("Generally, a New York unjust enrichment claim requires no direct relationship between plaintiff and defendant so long as the connection between plaintiff and defendant is not too attenuated.") (internal quotations and citations omitted).

> overpayment, including any interest allowed thereon, against any
> liability in respect of an internal revenue tax on the part of *the*
> *person who made the overpayment* and shall, subject to subsections
> (c), (d), (e), and (f), refund any balance to such person.

26 U.S.C. § 6402(a) (emphasis added). The Plaintiff argues that under *United States v. Williams*,

514 U.S. 527 (1995), the phrase "the person who made the overpayment" means the party who

funded the overpaid taxes. *See* Motion ¶ 12; *see also* Reply ¶ 27. As such, the relevant inquiry

is who furnished the money to pay the employment taxes and thus overpaid said taxes. *See*

Motion ¶ 13. As a threshold matter, the parties agree that *Williams* has been superseded by

statute and is no longer good law. *See* Opposition ¶¶ 86–89; Reply 15 n.8. But while *Williams* is

therefore of limited relevance, its reasoning supports the result here.[13] In dissecting the relevant

provisions of the tax code, the court in *Williams* stated that, under Section 6402(a), the recipient

of the refund is not the "taxpayer," *i.e.*, the party against whom the tax was assessed, but rather

the person who made the overpayment, and that Section 6402 "expressly contemplate[s] refunds

to parties other than the one assessed." *Williams*, 514 U.S. at 534.

The Defendants argue that the Plaintiff was required to pursue administrative remedies

before suing for the ERTC Refund. *See* Opposition ¶¶ 86–89. But the Court disagrees.

Defendants point to nothing that bars the Plaintiff's unjust enrichment action. *See Thompson v.*

*United States*, 429 F. Supp. 13, 15 (E.D. Pa. 1977) ("The fact that some third person may have a

superior claim to the money once it is refunded to plaintiff does not alter the fact that she is the

'person who made the overpayment' within the meaning of § 6402(a)"). In *Thompson*, the IRS

levied upon funds in the plaintiff's possession for unpaid taxes. *See* 429 F. Supp. at 14. The

plaintiff later claimed a refund for those taxes. *See id.* The *Thompson* court found that the

---

[13]     In the end, Defendants' arguments about the specifics of tax law are irrelevant and often confusing, and do not impact the Court's unjust enrichment analysis here.

plaintiff, holding those funds as bailee, had standing to maintain the refund action because the money was taken from her possession and applied to taxes against her. *See id.* at 15. The *Thompson* court concluded that Section 6402(a) "does not bar a taxpayer from obtaining a refund even though the overpayment of taxes was made with funds in [one's] possession as a bailee." *Id.* So even assuming that the Manager can be viewed as "the person who made the overpayment" under Section 6402, nothing precludes the Trustee here from later asserting its superior claim to the ERTC Refund in this adversary proceeding.[14]

## CONCLUSION

For all of the reasons stated above, the Court finds that the Plaintiff Trustee has satisfied its burden in proving that the Defendants were unjustly enriched by their retention of the ERTC Refund, a refund on account of the Manager's taxes which was paid with property of the estate. For these same reasons, the Court also finds that the Plaintiff Trustee has established its claim for turnover of the ERTC Refund by the Defendants and for its request of a written account regarding the disposition of the ERTC Refund to the extent that it is not still held by the Defendants.

Accordingly, the Motion is granted. The Trustee should settle an order on five days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon opposing counsel.

Regrettably, the Court notes that the Defendants' retention and disbursement of the ERTC Refund is consistent with their actions prior to and during the bankruptcy case, including their

---

[14]    To the extent the Court did not expressly address any other argument raised by Defendants, such arguments are denied as lacking merit.

attempt to hold onto the Debtor's intellectual property, *see, e.g.*, Adv. Pro. No. 22-07048, ECF

No. 50, and running the bankruptcy case for their own benefit prior to the Chapter 11 Trustee's

appointment.  *See, e.g.*, Case No. 21-22108, ECF No. 418 at 24.  The Court does not take such

conduct lightly, particularly as it greatly increases the costs associated with the administrating of

this case at the expense of creditor recovery.

Dated: White Plains, New York
        October 10, 2025

                                            ***/s/ Sean H. Lane***
                                            UNITED STATES BANKRUPTCY JUDGE